Good afternoon. May it please the Court, I'm Eric Weaver on behalf of Appellant Sessoms. This is Peter Paffenroth from Sidley Austin and Mark Haddad also from Sidley Austin, their counsel for Amicus. I'm planning to reserve five minutes of my 20 minutes for rebuttal. I think this case is a very important marker in the continuing vitality of Miranda. This Court will decide whether Miranda protects a young, unsophisticated and nervous suspect or only those hardened suspects with the legal system has schooled in the magic words required to invoke the right to counsel. I think that the first point is I think we're looking at plain language here. The plain language, as a reasonable person would understand it, is that Mr. Sessoms said, give me a lawyer. Only lawyers who are schooled in parsing language and trying to find separate meanings and different points could have any confusion about what's requested here. I think also it's important that the — this is the factual record. There was in the en banc opinion — I mean, in the panel opinion, there was a dispute about whether he said give me a lawyer or get me a lawyer. But in the State court opinion, they made a factual finding that it was give me a lawyer, which I think is even clearer. Didn't the — you know, when you read the — when you read his statement, there wouldn't be any possible way that I could have — his first statement, there wouldn't be any possible way that I could have a lawyer present while we do this. The State court appeal said that was a question. I think that that's a mistake because it breaks what was obviously a single thought into two separate pieces. He was interrupted by the police officer, Detective Woods, clearing his throat when he started his statement, and that — and his — it was a polite way of asking for an attorney. I think the proof — there are several factors in the record in the context that prove that that's the case. Well, that — I guess that we would have to then accept that the only way to look at it would be that it was a polite way, right? If it could be — could have been a question or it could have been a polite way, isn't that problematic for you if there's two ways to look at it? Well, I think that it has to be looked at in accordance with the totality of the circumstances. One very important circumstance in this case is that Detective Woods had no doubt what Sessoms was asking him because he went through a checklist of strategies to dissuade him from invoking his right to counsel. I would invite the Court to look at Miranda, pages 450 to 454. In citing the factual reason for articulating the Miranda rule, the Court listed a series of strategies that police officers are trained to use in order to dissuade a person from asking for his Miranda rights. And if you look at what Detective Woods here, he checked off the list of these training items that were illustrated in Miranda. You're supposed to have the defendant in isolation. Mr. Sessoms was in isolation. You're supposed to display an air of confidence about your understanding of the case and what you think the evidence shows. Well, what clearly established Federal case as by the U.S. Supreme Court says you can't do that? Is there — do you have a case? The case is — well, Miranda itself, the point is — in Miranda, it's okay to do that after you give the warnings. But Miranda recognized that these are strategies that if given prior to the warnings hold you swayed. Okay. If it's okay, well, I guess — is there any Supreme Court case that holds it's improper for officers to explain the information they already know from other witnesses or suspects prior to advising a suspect of Miranda rights as long as they don't ask him questions? All I want is a case. Miranda. Again, I really urge the Court to read Miranda, pages 450 to 454. They say that the reason we need to give this warning at the beginning of a custodial interrogation is because the police are trained to use these strategies. If the evidence — Well, isn't there something in the record that shows that these particular police officers had that — had a checklist in front of them or something that they were working through? Well, the questions that they asked — Suggest. They suggest. But Detective Woods was a detective for 30 years. He said he'd done thousands of interrogations. It's really uncanny how he followed the list of suggested strategies illustrated in Miranda for dissuading a suspect from exercising his rights. And at the end of Miranda, at the end of discussion of this checklist, as the reason why Miranda was cited, the Supreme Court said, Few will persist in their initial refusal to talk, it is said, if this monologue is employed correctly. So that is an important circumstantial evidence that Detective Woods, who's a reasonable person, clearly understood. Mr. Weaver? Yes. As I look at the Court of Appeal decision where they consider these statements, they say that, and they cite the reliance of the Superior Court, rather, judge's opinion, that this was not an unambiguous request. Now, do you agree that that is the right standard, that it had to be an unambiguous request? That's the underwriting issue in this case. I think that Davis, the unambiguous language of Davis, applies after a suspect has already invoked his rights and is attempting to withdraw that invocation. Do you know whether that distinction was made to the California court? In other words, that Davis was a post-waiver case? That I don't know, because I don't know. It's not in the record. Well, it's certainly not in the decision. The Court itself has all of the cases. The litigation until it got to this Court was based on the fact that Davis is the standard. Doesn't Bergwist change? Did anybody go back to see whether the arguments were made to the California court of appeal, that Davis was by analogy, not by because it was distinguishable? I don't think that that argument was made. Doesn't Bergwist change the rule? I'm sorry? Didn't the Bergwist case change that? I don't think it does. Well, I think the Bergwist case. The Second Circuit held that it did, didn't it? Right. Well, I think that the Bergwist case does hold that, does raise the inference that Davis is the standard regardless of whether it's before or after. Well, the court of appeal cites Davis 512 U.S. at 462. And if you go to 462 in Davis, they seem to channel Edwards. So it seems to me that there's a plausible case that, in fact, I mean, regardless of the subsequent case, which may, in fact, do that already as well. But it seems to me that there's at least a plausible argument that what the court was doing in Davis was saying this is a standard post and pre-waiver. I think that that's – I think that's a fair reading of Davis. But I think we meet the standard in Davis. I don't think that – I think only, as I said earlier, I think only lawyers who are trained to parse language do not understand this. Sotomayor, I want to make sure I follow you. So you now agree that the court of appeal was right in requiring an unambiguous request? I think that this – I think that this – the – I think that Davis does – the logic of Davis is that it applies after someone has been informed of their rights. I think that that would be the correct application. I don't think that there's – but I concede that Burgess still muddies the water on that particular question. But I think Davis – But the Burgess of Davis itself, we can't say that the court of appeal was manifestly wrong in reading Davis as applying pre-waivers versus post-waivers. I think where the court of appeal was wrong is that it's not an ambiguous statement. I think the ambiguous state – the statement is very clear, and I think all of the circumstances showed that. For example, shortly after this, but before he was read his rights, he asked, there wouldn't be any way – would it be possible that I can call my dad, ask him. That's phrased in exactly the same language that he used to ask an attorney. He – Detective Woods immediately said no. He understood with that, no. What's more, the court of appeal in California found – made a holding at ER 30 and said he asked for a phone call and he was told that he had to wait until he made his decision. So I don't – I don't think it's reasonable to say that when he uses that phraseology to ask for an attorney, that that's ambiguous. But when he uses exactly the same phraseology to ask for a – to call his father and everybody knows that that's what he wants, there's no – there's no reasonable distinction between those two statements. So is this an unreasonable determination of the facts, or is it a decision contrary to? I think it's a decision contrary to. The law is if he expresses any desire for an attorney, that's supposed to be honored. Well, but – all right. So you're saying you don't even need – but I just understood what you said to say that you don't really need de novo review because anyone that looks at that statement could only come to one conclusion. I think – I'm sorry. Did I over – over speak you? Well, I don't – that's what I heard. Okay. What I – I think that under de novo review, the – which I think is the correct standard of review, I think that it's clear that Miranda and Edwards are a broad standard and that there are a broad range of statements that have to be honored within the range of Miranda and Edwards. However, if the Court were to find that we're not entitled to de novo review, I still think we win under Davis because I don't think the – under the totality of the circumstances, I don't think the request is ambiguous. I think it can only be found to be ambiguous by parsing language in a way that a reasonable person, a non-lawyer reasonable person would do. Counsel, for purposes of determining whether this was an unambiguous statement, you have the statement in writing and you have it on a video. The video is manifestly more clear in terms of reading body language, if you will. Are we entitled to rely upon our own perceptions of what the video shows, seeing as we are appellate judges and not the original triers of fact? I think that under Cullen v. Pinholster, the Court is required to accept the factual determinations about what happened. And the court of appeal found that he asked, give me a lawyer. They also found that using the same phraseology he asked for to call his father. So and in one, the phraseology was deemed ambiguous and in the other it was deemed unambiguous. I think that that's. Kennedy. So you're saying we, of course, have to rely upon what was said, but are you saying that we are bound by how the court of appeals analyzed that? In other words, one ambiguous, one unambiguous? No. I think the standard for a Miranda case is that the first step is to set the table. The Supreme Court. And that means establish what words were said, what arguments were made, et cetera. Once that's done, then this Court looks at it, asks the legal question. What is the legal question? What is applied to this particular case? Okay. I want to be sure we're understanding each other. I get your point that even if Davis applies throughout the process, both before and after the Miranda warning, that you feel you're okay because you say that your client's statement is unambiguous. And my question to you is, I've looked at the video. To me, it's very clear when I look at the video what the answer is. I also have read the writing of what was said. Am I entitled as an appellate judge to exercise my own judgment in looking at the video, drawing my own conclusions, if you were, as if I were a trier of fact? I think you are, because the video is setting the table. Well, let me ask that. I think that's a very good question. I just want to ask it a slightly different way, because of Penholster. Did the court of appeal, which is the last recent State court decision, have the video in the record before it? Was it part of what undergirded its decision? It was part of the record. I don't know whether they looked at it or not. You don't know which individual judges looked at it. Right. I'm not sure.  I think it's very clear that just like some of us might have looked at it, others of us might not have, but we don't know which way or the other, but it was in the record. Yes. It's an exhibit in the record. If I were you, I'd assume we'd all seen it.  But if I know my colleagues. Pardon me? It's part of setting the table. And although I think on the one question of whether he said give me a record or get me a record, to the extent this Court finds that ambiguous, they have to accept that it's give me a lawyer, because that's what the court of appeal found. And from your perspective, if either statement, either one about what his father had said in his question or the other one about the first one that he made, if we find either one of those to be unambiguous as far as you're concerned, the table is set, he's asked for a lawyer. You can't ask anything until after a lawyer is there and he's been Mirandized. Is that correct? That's correct. Although I would also insist that the words themselves have to be looked at in light of the totality of the circumstances. And a very important circumstance is that Detective Woods knew exactly what he wanted. If he hadn't known what Mr. Sessoms wanted, he would not have followed the checklist to dissuade him asking for an attorney. Let me focus on another part of the task of the interrogation. Whatever happened in the beginning happened. And one way or the other, though, at some point later, before your client said anything of substance, I mean, anything about the case, anything that could be used as evidence, he is given the card. He reads himself the warnings. And if I recall correctly, after every statement, the officer asks him, do you understand this, do you have any trouble understanding it. And at the end of which, I mean, he says yes, he does understand, at the end of which the officer says, now, do you want to talk? And if I recall correctly, there is a silence of a few seconds, and then your client says, let's talk. Now, nothing substantive has happened between the original request and this. Why doesn't the subsequent reading of the rights, going over them, giving him a chance to think about them, and then giving him a choice? Why doesn't that itself constitute a waiver? Even if there was an invocation earlier, why isn't this a waiver which clearly complies with Davis? The Edwards, Smith v. Illinois, and McNeil v. Wisconsin are all clear that when there's an invocation, the questioning has to stop, and the police are not allowed to proceed to try to talk him out of invoking his waiver either directly or indirectly before actually giving the warnings. And that's exactly what happened here. I can't emphasize enough reading those five pages of Miranda. It's very clear that Detective Woods was doing that, that he succeeded. And just as the Cape Court said in Miranda, few will persist in their initial refusal to talk if this strategy is followed. Let me ask you this. How does the statement Mr. Sessoms made compare to that in Clark v. Murphy? I think I would like to talk to a lawyer where we held that that's not an unequivocal request for counsel. I think language is a question of context. It's not possible for any court to make a list of words and say these words are clear and these words are not clear. It's always about the context. I think in the context of this case, it's extremely clear that he asked for an attorney in light of all the factors that I've listed. And so I think that he asked for an attorney. Is it impossible to view it any other way? I think under a reasonable person standard, especially in light of Detective Woods' ---- So if someone says my father wants me to get a lawyer, you couldn't ---- it's impossible to interpret that as just a statement of what his father wants? I don't think so in light of the way in which he did it. He starts off right away saying he wants to have a lawyer, right at the beginning. He's muttering to himself before ---- Well, it was a question he asked right off the bat, wasn't it? It was a question mark on the end. There wouldn't be any possible way I could have a lawyer. Yes. And I think that's a polite way of ---- Okay. I agree with you. It's polite. How is that any functionally different from I think I would like to talk to a lawyer or excuse me, if I'm right, I can have a lawyer present throughout this. Isn't that right? Yeah. But here he says could my ---- is there any way you could give me a lawyer? I think the word give in the context of what's happening here changes it. And he's politely saying isn't there any way you can give me a lawyer? So your whole case turns on the word give, comparing this case to all the other cases? Yes. And also on the entire context. I'm mindful of the time. If the Court doesn't have any questions of me, I'd like to allow my ---- the amicus counsel to speak briefly. May it please the Court. Peter Fafneroth for the National Association of Criminal Defense Lawyers. Judge Callahan, just in response to your initial question about if there are multiple views of a single statement possible, what do we look to in terms of authority? And I would direct your attention to McNeil and to Miranda, both of which established a broad standard that errs in favor of an invocation. And those have never been revoked or exceptions made to them since they were established. They continue to apply so long as it is before a knowing and effective waiver. McNeil says ---- I'm sorry. I was just wondering about McNeil. When I read it, it was that one sentence I think is what was focused on. Now, the Supreme Court has told us to look at the holdings, not the dicta for clearly established Federal law. Is that sentence in McNeil a holding or is it dicta? I believe you could look at it as dicta in McNeil, but it was subsequently restated as the standard in Davis, which suggests that although Davis went on to create an exception for the post-waiver context, the very same language appears in Davis as the standard for invoking your rights. So even if it was dicta in McNeil, it would have been a holding as to Davis. I can't help but wonder sometimes when we have to talk about something so long, why isn't it ambiguous? Or when you get a split panel and you get assuming that if ---- making the great assumption that three judges on the Ninth Circuit are reasonable people. Which I can see. And two see it one way and another sees it another way. It's just ---- I mean, if I were trying a case, I would say, well, I rest my case. These people are all reasonable and, you know, some think it's ambiguous, some think it's not. The situation here, though, is that Davis upped the ante for an invocation after someone knew and understood and waived their rights, whereas Miranda at the threshold and then Edwards and McNeil all made clear that until you get to that point, you have to err in favor of an invocation, because the entire point of the Miranda construct was to protect witnesses and the stress of the interrogation room from the inherent coercion of that situation. And so this is sort of the opposite of a Strickland-type situation where you've stacked the deck against providing relief. Here, it's a Miranda context where we are erring in favor of an invocation at least until someone knows and understands and has voluntarily waived their rights, and that's why there's a heavy burden on the government up until they've shown that there is a waiver. What's your best argument that this case gets over the hurdle of AEDPA deference? The best case is Williams, because the State court applied an inapplicable exception by extending Davis to the pre-waiver context. But the other counsel just said even applying Davis. I'm sorry? The other counsel just said it wasn't, you know, not necessarily an error to rely on Davis. That may be his position. I think he is wrong on the law insofar as he said that. And I think he actually attempted to step back from that. I believe he stated himself. Okay. So Davis, you're saying at this time when the State court made this decision, Davis was clearly inapplicable and it relied on Davis? Right. Exactly. It didn't just rely on Davis, though. It relied upon a California State court decision to largely the same effect. It said Edwards. It quotes Edwards, but its analysis hinges on the clear statement rule. It didn't even analyze whether or not if you flip the burden and have it be erring in favor of an invocation as opposed to erring against an invocation, which in my view is what Davis does, whether or not this statement would have satisfied the Miranda-Edwards-McNeil standard. It seems to me that Early v. Packer is a little bit of a problem for you in the fact that the State court, it's not required to cite Supreme Court cases or even be aware of them as long as neither the reasoning or the result of the State court decision contradicts them. And it seems to me that that Davis argument sort of falls into that category. I think the problem with Early and its application here is that that argument would effectively eliminate all habeas review, because you can, if in a case like this where the State court expressly relied on the wrong authority and applied the wrong analysis and actually reached the wrong conclusion, but you might be able to take a step back and hypothesize, well, if the court had analyzed the correct standard, maybe it would have reached a different conclusion but still admitted the statement, then effectively habeas review is gone. And I think actually the correct standard under AEDPA is, going back to Terry Williams, if you've got an inapplicable exception being applied, then it is an unreasonable application of law. And the State or the Supreme Court has never stepped back from that. They've stated repeatedly, as recently as last term, that no deference is due where a State court applies the wrong standard. Why, again, do you think it's an applicable exception? Because it has never been extended to the pre-waiver context, and it's not. What about Burgess? Burgess didn't do so. Burgess hinges on the fact that the Court found that there had been a waiver, a knowing and effective waiver. It was implicit. He never articulated it, but he was given his rights and the Supreme Court expressly finds that there was a waiver. Whereas Davis, Davis's key holding is, quote, we therefore hold that after a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning unless and until the suspect clearly requests an attorney. It hinges on the primary protection of the warning, the Miranda warnings themselves, having been given. But did the Supreme Court ever say that the standard in Davis for what constitutes a clear invocation can't be applied to the pre-waiver context? It didn't have to because Miranda had already established what the standard was in Davis. Miranda is a very general standard, right? So Merzion, the Supreme Court, has said when you have that general a standard, then we give a lot more leeway to the State courts. That is true, but as the Court pointed out in Panetti, even a general standard may be applied in an unreasonable manner, and ADPA doesn't require State and Federal But I guess I'm wondering, I'm just puzzled why, that the language in Davis and in Edwards and Smith is all saying, here's what it takes to invoke your right to counsel. It has to be clear. And why is it unreasonable or wrong for a State court to apply that at any point in trying to evaluate an invocation where the Supreme Court hasn't said, no, it's limited to this context? With all due respect, I think that flips the analysis. It takes what was a pro-invocation standard and flips it. And there was a good justification for doing that in Davis. It was because the witness had already made a knowing waiver and understood the rights. But that's a really good argument to make to the Supreme Court when you're saying don't apply Davis to a pre-invocation, but no case has said that. You know, that's, you know, we're stuck with what existed at the time. You're making a good argument for that, but there is no case that says what you're arguing. I believe that if you look at Williams, though, Terry Williams, that talks in general about how invocation – about how exceptions to generally applicable rules do not need to be extended to every single case. And Miranda set the broad rule, and the broad rule continues to apply except in those cases where the Supreme Court has changed it. Hasn't the Second Circuit held that the Supreme Court has changed it? The Second Circuit's decision in the United States v. Plew came out and was – it did reverse its prior ruling, and the reason it did so was because it found that its own facts were identical to the facts in Burtis. In both cases, the witness had been given Miranda warnings and had simply not responded. And over a course of a period of time, both courts found that that constituted an implicit waiver. No, what I'm talking about, the language, the Burgess court made clear that for a defendant successfully to invoke his Miranda rights, he must do so through a clear, unambiguous, affirmative action or statement. I believe that overreads Burgess, because Burgess – So you would have us be at tension with the Second Circuit, then? In this case, I would, because I believe there is no justification for reading Burgess so broadly. Davis's – I would direct you – I would suggest that a close reading of Davis suggests that its analysis hinges on the fact that there had been a knowing, involuntary waiver. And before that knowing, involuntary waiver, there's no justification for applying the heightened standard that Davis created. Whereas Burgess explicitly relied upon the fact that there had already been a waiver. So if I – But the Second Circuit says about Davis isn't binding on us in an ad hoc context anyway, is it? No, it is not. Thank you. I see there's hardly any time reserved, but I'd like to use the microphone. Thank you. We'll hear from the Warren. May it please the Court, Jeff Firestone, representing Respondent FLE. This Court is not just concerned with whether a reasonable peace officer in the circumstances – viewing the totality of the circumstances would view the statements as being an ambiguous invocation of the right to counsel, but rather whether any fair-minded jurist reasonably could find, in viewing the totality of the circumstances from an objective standpoint, that a reasonable peace officer would have understood appellant's words to be ambiguous. And it's the Warden's – it's the Respondent's position that that is the case, that the State court got it right. So what do we do with the fact that the deputy who was jumping into his explanation of why a lawyer wouldn't be a good idea, there seems to be a lot of force in trying to adjudicate whether a reasonable police officer would have understood a request for  And there's a lot of force in trying to get a reasonable police officer involved in it. And certainly, he gave all the indications that he knew he was trying to argue sessions out of pursuing a request for counsel. Well, first, we would disagree that the officer did that or that a fair-minded jurist could reasonably find that. If he made an invocation, then that would be the end of it under Edwards. As far as the officer trying to talk him out of his invocation, we would disagree. The officer informed him so he could make a knowing, intelligent waiver, and he even red-flagged things for him, saying that we This isn't about a waiver, counsel. This is about an invocation. A waiver would be, had he been advised of his right to counsel on, he knowingly and intelligently and voluntarily waived it. This is what he said. Did what he say at the outset of the interrogation clearly convey that he was he wanted a lawyer? At the outset of their meeting, yes. Did he say that? That invocation is at issue. And what he said was, there wouldn't be any possible way that I could have a lawyer present while we do this. And that's what he said at the outset of the interrogation.  while we do this. Looking at the video, he appears uncertain in that, and his words suggest a negative possibility. There's at least three different ways. I think they're overly polite, but he's saying, might, you know, would there be any possibility he might get, give me a lawyer. At one point he says, give me a lawyer, according to the State court of appeal. I don't understand how that's not clear. Well, there's one way to interpret it is that he's being polite, but there are other reasonable interpretations. And what this Court is concerned with is whether any fair-minded jurist could find, under the circumstances, that the words were ambiguous. And he stated a negative possibility. There wouldn't be any possible way that I could have a lawyer present while we do this, which there is, there could be. Did the police directly answer that question? The detective did eventually answer that question and let him know. In response to that question, what did the police officer do? Well, the officer started to respond, and then he interrupted the officer when the officer was speaking. And then he said, yeah, that's what my dad asked me to ask you guys, get me a lawyer. And now that... Then what did the officer do? Then what did the officer do? Well... He started saying, well, don't worry, you know, we don't really need to have a lawyer. No, the officer did not say that at all. I'm not using literal words. When he's saying, you know, we have all these other things that are happening, we're going to be straight with you, we're going to do this for you, all these assurances have been given, your friends have already confessed. Well, the officer let him know that these are your charges, we know you weren't involved in the stabbing, we've already talked to the cohorts, they surprisingly waived their rights, you don't have to talk to us. In fact, if you do talk to us, we can't, excuse me, if you do ask for an attorney, we can't talk to you. It ends right here. And whether you not want to talk to us, that's your decision. In fact, when the officer talks to him, the officer uses inflection in his voice and he says, it's up to you to decide whether or not you want to exercise that right. Which would indicate that the officer was confused by his saying that that's what my dad wants me to do. Well, I guess they're saying that the officers went through a list and were sort of checking it off. I'm understanding you to say they're just experienced interrogators and, you know, you don't go, you know, some people will talk to some people more than they will to others and it may not, they may not have invoked. I mean, they were pretty good interrogators, I've got to give it to them. I think all the experience they had showed up. They looked kind of, looked a little, you know, sort of Columbo-ish, but they were pretty slick in what they knew how to say. They're from Sacramento, you know. They informed him of what his rights were, that he had the right to counsel, that he didn't have to talk to them, that it was a decision that was totally up to him. And in fact, when he asked about when they were going to read him his rights, he says, well, can I call and ask my dad? They said, no, you're an adult. That's a decision you're going to have to make, but they're pretty nice here. They'll probably let you make a call whether or not you decide to talk to us. Let me tell you, I, when that officer got done, I was ready to confess. I wanted to talk to him. The counsel, if he gets convicted or not, we'll leave it to another point. But as far as this particular case is concerned, when you look at this, you talk about a fair-minded jurist. When we look at the video and we see this young African-American man responding to the questions and look at the environment, is the fair-minded jurist standard or you're asking us to say that if they look at the video that the members of the District Court of Appeal couldn't possibly be fair people if they construed it in any way other than what they put in their opinion? Is that the standard? No. What's the standard then? The standard is whether any fair-minded jurist reasonably confined under the circumstances. Does that mean us or them? That means any. If I'm a fair-minded jurist and I look at that video, and I'm just speaking hypothetically here, if I say, you know, look, this young African-American man in this context, this is the very kind of thing that Miranda was designed for, to protect him, to make certain that he doesn't start talking until he has counsel that understands the system. Just say hypothetically I said that. Under the Ed Park, can I make that decision based upon what I observed in the video, taking into account the totality of the circumstances? Well, it's whether or not the State court was – could reach the determination that it did as a fair-minded jurist. And so there can be a difference in opinion as far as – and the words are ambiguous. There's several different interpretations. And is one reasonable interpretation that they were ambiguous? And it's the State's position that, yes. So you're telling us that under Ed Park, that if a member of the State court of appeals, district court of appeals, looking at the video, reading the information that's down in print, concluded that this was ambiguous, as long as that was conceivable, fair-minded decision, that's the end of the story insofar as ambiguity is concerned? That's – that's what I'm saying. What we had was the State court of appeals was reviewing the trial court's ruling and whether or not that should be upheld. And the trial court had found that it was ambiguous and that it wasn't a clear implication of the right to counsel. That's because it's – well, go ahead, finish this question. I was going to say, isn't that the very point that we're talking about? How do we potentially review whether something under the totality of the circumstances is fair if we can't make our own determination? I know we're reviewing what the trial court did, but I guess my question to you is, are we bound by what the State district court of appeal found, and do we have to determine that they were unfair if we don't conclude that there was a lack of ambiguity, at least in one question, for example? Well, to tie that in with your earlier question to counsel about viewing the video, as far as we've got the audio or – and we have the written transcript. Right. You have to look at the totality of the circumstances. So both of those are a part of the record, right? Both of those are part of the record. Right. As far as we've got an on-the-record finding by the State court that it was ambiguous, you have to – there's a presumption that the State court did what it was supposed to do, and impliedly, the court took into account the inflection, the tone, the mannerisms, all of that. And so there – so then you'd have to yield out of deference as long as it wasn't an unreasonable or contrary to, and there's no dispute as to what the facts were said. Okay. Counsel, I'll just refer you to page 549 of the transcript, which is ER, whatever the ER cited, 98, and I'll just read it to you. It goes – this is after the beginning. This is when the subject of counsel comes up, is at the beginning. And then what the detective does is, let's say, generously deflects the issue and goes through a list of what he's going to do. And then he comes up on lines 23 and 24 and say, after I'm going to advise you of your rights, and then it's up for you to decide if you want the attorney or not. Now, the only request for an attorney that could have been made was in those opening statements, as far as I know. So it does seem to me, to come back to my original question to you, if we're looking at what the police officer, reasonable police officer, would have understood the opening to be a request or not, the detective winds up with this statement, it's then up to you to decide if you want the attorney or not. So it sounds to me that the detective certainly understood the opening to be a request for an attorney. It wasn't ambiguous, it just – he wanted to make sure that before he actually followed through with his request, he wouldn't go along with the game plan that the detective had in mind. Well, I would respectfully disagree. And if you look at the words of the detective himself, they would tend to refute that. Again, there's no doubt that a lawyer was referenced and that the understanding, yeah, that's what my dad told me to ask you guys, get me a lawyer, was he was referring to a lawyer. So the fact that the detective references an attorney later on down the line, he's obviously referring back to that. The key thing – I'm sorry. The key thing what the detective says is, once they're on tape, he goes, I want to back up, and says, this way there is a recording and you know we can't play no switch games or nothing else. I want to back up to your question. You asked about an attorney. Notice he says about an attorney. He doesn't say you asked for an attorney. He says you asked about an attorney. Well, there's no doubt he did ask about a lawyer. He wanted to know – he said his dad asked me to ask you guys, get me a lawyer. He stated a negative possibility question. There won't be any possible way that I could have a lawyer present while we do this. So he asked about an attorney. He didn't affirmatively say I want an attorney. And one thing that counsel pointed out is when he asked about calling his father, he stated the exact same wording, the exact same phrasing. Well, no, he didn't. When he speaks later about his father, he says – give me just a moment to find it. Would it be a possible chance that I can call my dad? That's different from there wouldn't be any possible way that I could have a lawyer present while we do this. One stated in the negative possibility, the other stated in the affirmative possibility. These are coming at the officer fast and quick. As soon as the officer starts to respond to his initial question about a lawyer, he interrupts the officer and he says, yeah, that's what my dad told me to ask you guys, get me a lawyer. So he's saying somebody else told me to tell you guys to get me a lawyer. It's not the same thing as saying get me a lawyer. And it's much like what was said in Smith v. Illinois's preface to when the defendant made a clear indication that he wanted an attorney. Counsel, what would the correct answer to the first inquiry be? Well, there's multiple possibilities. No. Wouldn't the correct answer be yes? No. That actually, with all due respect. Well, no. Read me the query. Okay. The query is there wouldn't be any possible way that I could have a lawyer. Excuse me. There wouldn't be any possible way that I could have a lawyer present while we do this. Now, what's the correct answer to that? If he answered yes, then that would mean there wouldn't be any possible way that he could have a lawyer present, which is totally wrong, because there is a possible way. So to answer yes would be wrong. If he says no, that's confusing as well. I don't understand why yes is not the correct answer, and it was not given. The one is the detective got interrupted, so we don't know what the detective was going to say. Two is if he said yes, again, that would mean yes, there wouldn't be any possible way you could have a lawyer present. There's no possible way you could have a lawyer present while we do this. That would be totally incorrect. And from a – I don't understand. Explain that statement. I don't – say that again. There wouldn't be any possible way I could have a lawyer present while we do this. If he says yes, yes, there wouldn't be any possible way. Yes, there's no possible way you could have a lawyer present if you were to say yes. The other thing is – It just seems like you're torturing us with that response. I wouldn't get off there and just say yes. Or you could – yes, you could have a lawyer. That suggested a question. We can't say, you know, why couldn't the officer do this or that. We have to deal with what was said. And – Well, we have to deal with what the defendant said, and you're parsing his formulation of the question in such a way that you rely on a highly literal interpretation of what in context is a real stretch. Well, it's not just the words that he used. It's the tone, the inflection, his demeanor. And looking at the video, he appears to express uncertainty. He's not sure if he could have an attorney present while they do that. Let me ask you another question. In the totality of the circumstances, is one circumstance we're looking at is that he came – the defendant came in to confess. I mean, his whole purpose of going into the Sacramento police office, police department, and then these officers flying out from Oklahoma was because he was going to confess, right? I missed the last part where you said the officer – Wasn't it – I mean, Sessoms went into the Sacramento police station intending to confess, right? No. He didn't? The circumstances are that he turned himself into the Oklahoma – or in the state of Oklahoma, and he turned himself in five days earlier. Okay. So he turned himself in. Correct. That means he was going to do something in connection with admission of some aspect of his – of the crime, right? Not necessarily. Well, why would he turn himself in? Because there was a warrant out for his arrest. Right. So he turned himself in. And he went to the police. Now, he didn't go to the police with a lawyer in hand, right? Right. Now, why would that be? I mean, if you were rich and you were going to turn yourself in, wouldn't you take a lawyer with you? We're getting way off – without respect. I mean – No, we're not. No, we're not. I'm just wondering, as a practical reality, if someone goes to turn themself in and they want to be all lawyered up, they're going to take a lawyer with them if they can afford it, right? Not necessarily, but he – Why not? He – I'm not – he turned himself in to the Oklahoma police. He turned himself in, what is he doing? You're – you're surrendering to the authorities, and – because he's charged with route scanning. In fact, his father is the one who counseled him to turn himself in. Right. Right. And also counseled him to get a lawyer when he talked to him. Well, his – he expressed his dad's words that my – that's what my father told me, that – to ask you guys was to get me a lawyer. You don't believe that was true? You don't believe it was true? So his father – No, I mean, the excuse that that may have been what his father told him and his father was that we need a reasonable police officer in the circle – I'm just trying to look at the whole context of this thing. I mean, he's turning himself in, he's talking to the police, and he raises a lawyer right at the outset. Well, it wasn't right at the outset because, first, he greets the officers. They exchange pleasantries. He says they change places. He indicates he knows one of the officers. He tells the officers how to correctly pronounce his name. He moves to another side of the table when they suggest that he moves. And then when the detectives say they're there from Sacramento Police Department, that's when he says there isn't any possible way I could have a lawyer present while we do this. And the way he says it is with some – While we do what? Well, there's no question that it's while he meets with the officers. It's not for some purpose down the line. Can I – can we go back to the question that he asked? So the State court of appeals said it was ambiguous because the statement was phrased as a question. Correct? Correct. They said it wasn't a statement as far as asserting. So let me ask you, is it your position or the State's position that a request for a statement when phrased – a request for a lawyer when phrased as a question can never be an unambiguous request? No. That wouldn't be our position. Okay. So what's the problem with this statement, then? There wouldn't – Where he uses the language, there wouldn't be any possible way? Well, that's – because he used that language, it was – Suppose he just said, may I have a lawyer? That would have been clear. That would have been clear. Okay. So he goes on after he was interrupted. The lawyer – Detective Woods says, well, what I'll do is – and then Sessom starts up again. Yeah, that's what my dad asked you – to ask you guys, give me a lawyer. Now, that's not a question, is it? No. That's – he's standing – Why is it just a simple, clear, give me a lawyer? Well, I – the detective said he actually said, get me a lawyer, but I'll – Well, it says here, give me a lawyer. That's what the transcript says, but the detective corrected it at the hearing. But regardless, he's expressing, that's what my dad asked me to ask you, get me a lawyer. It's not expressing, that's what I want, get me a lawyer. He's saying that my dad told me to tell you guys, get me a lawyer. It's not saying, I want a lawyer. So he's conveying what his dad told him to say, give me a lawyer. He's conveying his dad's desire, his dad's wishes, not necessarily his own desire, his own wishes. And if you go back to when he says, there wouldn't be any possible way that I could have a lawyer present while we do this, one reasonable interpretation is, he's trying to find out if one is available, because his dad wants him to have a lawyer. Not necessarily because he wants to have a lawyer. He just wants to know if one is available. And then he says, yeah, that's what my dad told me to ask you guys, was get me a lawyer. Not, that's what my dad told me, get me a lawyer. That's what my dad told me to ask you guys, get me a lawyer. Well, if you put these two statements together. You have to consider them together, I think. Well, if you put them together, it sure looks like he's asking for a lawyer. Well, the fair-minded jurist reasonably could find, and that's the standard this Court has to look at, that it's ambiguous, that there are other ways to interpret it. And another way to interpret it is, he first indicates at least one of three things, is it isn't even possible to have a lawyer present while we do this, or is one available, should I choose to invoke that right, or third, I choose to invoke that right. When you couple it with, yeah, that's what my dad asked me to ask you guys, get me a lawyer, it becomes clouded. It clouds the issue because now he's expressing his father's views instead of what his views are. And that's where the detective, when the detective interacts with him, and he tells him, and the judge pointed to that page of the transcript, and I don't know if you know this, but I believe it was page 549, when the detective says, then I'm going to advise you of your rights, and then it's up for you to decide if you want the attorney or not. And he emphasizes the word, you, which... Wait a minute. Who says, you? The detective. In the video? In the video. And he stresses the word, you. And then later on down the line, when he reads it again, and also the detective says, if you said you didn't want to make any statement without an attorney, we're not really going to be able to talk to you and get your version of it. If you said you didn't want to make any statement. Right. So why would he, why would the police officer assume that Sessoms was just expressing the desire of his father to have a lawyer and that his own desire was different? Because kids and parents disagree on lots of different things. Sessoms is an adult. He's 19 years old. He can make up his own mind. Just because his dad wants him to have a lawyer doesn't mean that he necessarily wants a lawyer. And so the detective proceeds to advise him of his rights and says, that's your decision to make. It's not mine. It's not Detective Keller's. It's your decision. Again, there, when he goes over that again, he emphasizes you when he tells him that. Let's say we disagree with your position on that first exchange. What is your, you have a question I asked opposing counsel about whether the subsequent reading of the waiver would wash out the effect of the earlier location. So, so let's say we disagree and find that this was, in fact, a request for a lawyer. Does the fact that he subsequently gets a full warning and then is asked to give a full warning, do you agree with the opposing counsel? If we get to that point in the analysis. If it was a clear invocation and no fair-minded jurist could disagree and they could find that it was a clear invocation, then all questioning would have to cease and we'd be done. And the second, the subsequent waiver wouldn't matter. You know, I just want to know your position. To uphold the condition, I would like to say yes, but given that Edward says you have to stop, you can't go on, because one could interpret that. I mean, where do you draw the line? It could be considered badgering. The guy already invoked. He already invoked, and so you can't go on. And so that would be inappropriate. Here, it wasn't that scenario.  I think the lawyer's argument is that the defendant was not able to read by reading him his rights, which, like in the duty case that this Court is very familiar with, he went through. He had the defendant read along the card with him. He made sure the defendant could read. And when the defendant said, read the first right, you may have the right to silence, the detective says no, no, no. It's you have the right to silence. And he went through each right, made sure that he fully understood to make a knowing and intelligent waiver if he wanted to. In fact, when the defendant or when the detective finishes reading him his rights, he shrugs his shoulders. The detective then says it's totally up to you. So we don't even have an implied waiver of Miranda once that happens. The detective waits for him to respond, and he says let's talk. And that shows, too, he had the clear ability to make a clear statement if he wanted to, let's go forward and talk. One thing that Judge Kaczynski mentioned is it appeared that in citing Davis that the State Appellate Court was channeling Edwards. And that's what the State Court was doing. It was referring to Edwards. It used Davis. But one of the things it pointed out with Davis is that you don't have to speak what the – I don't know the exact words, but like the discrimination of an Oxford Don. But you still have to be clear in your words. And here, Sessom's words were not clear and unequivocal. Kennedy. Counsel, that reminds me. Do you know whether or not the argument that Davis was a post-waiver case was made to the California court of appeal? I do not believe there was a clear distinction. I'm not positive on that. I don't believe one way or the other. I believe the California court of appeal applied it by analogy for the propositions that it cited. I don't believe that distinction was made. I do know in the trial court, the trial court considered Davis, cited to it and said that none of the cases I have before me are clearly on point for this scenario. And that it's the people's position that it wouldn't be an unreasonable application of Davis v. United States because there's nothing, no U.S. Supreme Court precedent that says you cannot apply Davis to the pre-waiver context. Although the waiver clearly was a lynchpin of the Davis decision, because they were undoing something where he had been carefully advised previously. Well, what Davis, yes, once he had waived, if he wanted to undo that, he had to be clear about it. And here's the situation. Again, from the reasonable officer's standpoint, as far as this officer knows, the defendant maybe doesn't know about his rights, never been advised of his rights. It would be quite a different story if this officer had known the defendant had been advised of his rights. And that's one thing, too, is that what the Davis court could have said was, you know, when a defendant, having been advised of his rights, starts talking about a lawyer, then you have to assume that he wants a lawyer. That's not what the Davis court said. But here this officer isn't sure this defendant knows what his rights are. In fact, the way he says it, there isn't, excuse me, there wouldn't be any possible way that I could have a lawyer present. Is this a long way of saying that Davis didn't specifically hold that it only is post Miranda? So the court couldn't have been wrong even if it did look at Davis pre-Miranda? Well, I believe Davis said that it applies after a waiver, but it didn't specifically hold that it wouldn't apply pre-waiver. Not what I just said? Yes. Okay. I would agree with you. Okay. I just want to make sure I didn't say what I didn't mean to say. I should have just said I agree. Okay. Yes. Okay. Lastly. I'm getting confused here. I'm almost out of time. I noticed that the appellant's reply brief has repeatedly said how that the officers had assured the defender, told the defendant that a sentencing judge would take into account if he cooperated and if he spoke to them. And that's nowhere in the pre-Miranda colloquy. It was never said. It was never made those representations. And with that, if the Court has no further questions, I would submit the matter. Thank you. Thank you for your time. I think you're out of time. We'll give you a minute for rebuttal. One minute. On the question of a fair-minded jurist, the fair-minded jurist standard is an objective, albeit deferential, standard. In Williams v. Taylor, the Court specifically said at the outset of the AEDPA litigation that, of course, Congress is aware that reasonable jurists will disagree. The mere fact that lower court judges don't agree with the ultimate result doesn't mean that fair-minded jurists, the fair-minded jurist standard has not been met. And, in fact, in every case where the Supreme Court grants a habeas petition, there has been disputes among the judges below. So it's not the fact that the Court of Appeal of California made this finding that makes it reasonable or unreasonable. On the question of general versus specific standard, a general standard, first of all, Panetti makes it clear that an application of a general standard can still be unreasonable. We have a different case than an ineffective assistance of counsel. In an ineffective assistance of counsel case, the system is very broad of reasonableness. Here, it's a very broad standard of invocation. Which means a broad amount of statements should fall within that. Thank you. Thank you very much. The case is argued. The time is submitted. We're adjourned.
judges: Kozinski, Schroeder, Fletcher, Silverman, Wardlaw, Fisher, Paez, Callahan, Smith, Ikuta, Murguia